UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

VALERIE HOFFMAN,

               Plaintiff,

                                          Case No. 12-10354

v.                                        Honorable Thomas L. Ludington

SAGINAW PUBLIC SCHOOLS,

               Defendant.

_____ /

**OPINION AND ORDER GRANTING DEFENDANT'S MOTION
TO DISMISS AND DISMISSING COMPLAINT WITHOUT PREJUDICE**

In this student-on-student harassment case, the defendant's motion to dismiss raises a dispositive question that the complaint does not answer:  Why did one young man allegedly bully the plaintiff's son?  Was it based on the victim's disability?  Was it based on the victim's sex?  Or was it based on some other reason, such as personal animus?

The mother of the alleged victim, Plaintiff Valerie Hoffman, brings suit against the school district, Defendant Saginaw Public Schools.  Plaintiff alleges that her son, M.M., was bullied by a fellow classmate, D.K., as well as other students.  The alleged harassment included wishing M.M. happy birthday when it was not his birthday, teasing him when he said he did not plan on attending a school dance, ignoring him on a school field trip, throwing food at him, mocking his posture, and referring to him "as a lesbian, gay, or a hermaphrodite."  Plaintiff further alleges that Defendant was deliberately indifferent to this conduct, violating Title II of the Americans with Disabilities Act, the Rehabilitation Act, Title IX of the Education Amendments of 1972, and associated state law claims.

Defendant now moves to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  ECF No. 7.  The facts alleged in the complaint, Defendant correctly observes, do not suggest that the reason why M.M. was harassed was either his sex or his disability.  "[T]he conduct of jerks, bullies, and persecutors is simply not actionable," the Sixth Circuit instructs in a related context, "unless they are acting because of the victim's gender" (or, in this case, because of the victim's gender or disability).  *Wasek v. Arrow Energy Servs.*, --- F.3d ----, 2012 WL 2330824, at *3 (June 20, 2012) (discussing same-sex harassment under Title VII); *see Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 617 (1999) (noting that the Court looks "to its Title VII interpretations of discrimination in illuminating Title IX").

Accordingly, the Court will grant Defendant's motion and dismiss Plaintiff's complaint without prejudice.

## I

Because Defendant moves to dismiss pursuant to Rule 12(b)(6), in evaluating whether Plaintiff has stated claims on which relief may be granted the following facts from the complaint must be assumed to be true.

M.M. is a young man with hereditary multiple exostoses.  As its name suggests, the condition is hereditary and involves multiple benign bone tumors and growths called "exostoses."

M.M. attended two schools operated by Defendant.  The first is the Handley School Program for Creative and Academically Talented, which serves children from kindergarten through fifth grade.  M.M. began second grade in the fall of 2005.  Sometime during the school year, M.M. "became the target of bullying . . . by various classmates and more specifically

another minor, D.K."  Compl. ¶ 8.  (No further details regarding bullying during second grade are provided by the complaint.)

Two years passed.  Sometime during the 2007–2008 school year, Plaintiff informed the school principal that M.M. was being bullied by fellow fourth graders.  *Id*. ¶ 11.  (Again, the complaint does not provide any details regarding how M.M. was bullied.)  The principal responded by convening a meeting with the school psychologist, social worker, teacher, and Plaintiff.  *Id*. ¶ 15.  The meeting was unproductive, however, as "the participants in the meeting repeatedly focused on [M.M.] and blamed him for the bullying."  *Id*. ¶ 16.

About this time, M.M. began seeing a pediatric psychologist.  The psychologist later spoke to the school principal, who asserted "there was no bully problem at Handley."  *Id*. ¶ 14.

M.M. began fifth grade in the fall of 2008, and the bullying persisted.  *Id*. ¶ 17.  (Once again, the particulars of the bullying are not specified in the complaint.)  Plaintiff brought the problem to the school board president's attention.  *Id*. ¶ 18.  He instructed Plaintiff to email the school's safety director.  *Id*. ¶ 19.  Plaintiff did so, but received no response.  *Id*. ¶¶ 20–21.

As fifth grade came to an end in June 2009, Plaintiff accompanied M.M. on a school field trip.  *Id*. ¶ 22.  On the trip, "various children refused to sit next to M.M., made him the target of jokes, and effectively ostracized him."  *Id*. ¶ 23.

When M.M. began sixth grade in the fall of 2009, he moved from primary to middle school, where he attended another school operated by Defendant, the Saginaw Arts and Sciences Academy.  *Id*. ¶ 24.  As the school year began, Plaintiff met with the middle school principal to "explain the previous incidents of bullying experienced by [M.M.] at Handley."  *Id*. ¶ 25.  The principal told Plaintiff that bullying was not tolerated at the middle school and "agreed to alter

[M.M.'s] schedule to eliminate any shared classes with D.K." *Id.* ¶ 26.  Despite the principal's promises, however, M.M. and D.K. did share classes.  *Id.* ¶ 28.

Three times during the first week of school, "D.K. verbally and physically abused [M.M.]" *Id.* ¶ 29.  (No further details regarding these incidents are provided by the complaint.) In the following months, other students harassed M.M. as well.  *Id.* ¶ 31.  Specifically, on one occasion fellow students asked M.M. if he planned to attend a school dance.  *Id.* ¶ 40.  When he said that he did not plan to, "the various students began mocking [M.M.]."  *Id.* ¶ 41.  Likewise, in the spring of 2010 "classmates began repeatedly wishing [M.M.] 'Happy Birthday,' even though his actual birth date is in the month of September."  *Id.* ¶ 36.

To address the students' treatment of M.M., Plaintiff met with the school social worker. *Id.* ¶ 33.  Raising concerns regarding the bullying, Plaintiff informed the social worker that M.M. "had made several comments that no one liked him and that he contemplated suicide."  *Id.* ¶ 34. The social worker, however, "failed to address Plaintiff's concerns; instead, she discussed [M.M.'s] difficulty making friends."  *Id.* ¶ 35.

As sixth grade was coming to an end, Plaintiff attended "a pupil service team meeting" with the school social worker, members of administration, and M.M.'s teachers.  *Id.* ¶ 44.  At the meeting, Plaintiff voiced her concerns regarding the bullying.  *Id.* ¶ 45.  Once again, the meeting proved unproductive.  The group did not discuss "how to end the harassing and bullying treatment towards [M.M.], but instead focused on [M.M.'s] behavior."  *Id.* ¶ 46.

When M.M. entered seventh grade in the fall of 2010, the bullying continued.  *Id.* ¶ 47. In February 2011, the school social worker informed Plaintiff that D.K. and others had set into motion a plan that prevented M.M. from using the restroom.  *Id.* ¶ 49.  Specifically, observing that M.M. "frequently used the restroom at a particular time of day," D.K. and other students

ensured "that the hall pass, which was needed to use the restroom, was always in use [during that particular time of day]." *Id.* ¶ 49.  Defendant addressed this conduct by allowing M.M. "to sign out to use the restroom at the teacher's desk instead of using a hall pass." *Id.* ¶ 75.

On February 25, 2011, the school social worker, Plaintiff, and D.K.'s mother met to discuss the bathroom issue. *Id.* ¶ 50.  Although the ladies "discussed the recent incident of harassment, [they] did not alter the School District's handling of the harassment." *Id.* ¶ 51. Afterwards, "D.K. began referring to [M.M.] as a lesbian, gay, or a hermaphrodite." *Id.* ¶ 52. Moreover, D.K. "repeatedly told other students . . . that [M.M.] was gay."[1] *Id.* ¶ 53.  (Although not spelled out in the complaint, it appears this conduct occurred in the school locker room. *See id.* ¶ 55.)  Plaintiff brought D.K.'s conduct to the social worker's attention. *Id.* ¶ 54.  Defendant responded by permitting M.M. "to leave a physical education class early so that he could avoid the bullying and harassment in the locker room." *Id.* ¶ 55.  Defendant did not, however, punish D.K. *Id.* ¶ 56.

On May 5, 2011, "D.K. made an obscene gesture during a physical education class where he indicated that [M.M.] had male genitalia in his mouth." *Id.* ¶ 59.  The next day in physical education, "a physical altercation ensued between [M.M.] and D.K." *Id.* ¶ 61.  (The particulars of the altercation are not specified in the complaint.)

As seventh grade was coming to an end, Plaintiff attended another pupil service team meeting. *Id.* ¶ 62.  At the meeting on May 9, 2011, the social worker "identified Defendant's concerns related to conflicts between [M.M.] and D.K. and [M.M.'s] lack of friends.  Plaintiff

---

[1] Paragraph 53 of the complaint implies that this conduct occurred while the two young men were in sixth grade, not seventh grade, alleging that "following the meeting [on February 25, 2011], D.K.  repeatedly  told other students in sixth grade that Plaintiff's minor was gay."  Compl. ¶ 53.  This reference to sixth grade appears to be a scrivener's error, however, as the complaint makes plain that M.M. was in sixth grade during the 2009-2010 school year and in seventh grade during the 2010-2011 school year. *See id.* ¶¶ 24–47.

had to correct [the social worker] stating that D.K. was bullying her son and that her son had many friends." *Id*. ¶¶ 63–64.

Also on May 9, M.M. complained to the school social worker that D.K. had "mocked [M.M.'s] stance and posture affected by [multiple hereditary exostoses] and poked his arm out of his sleeve to mimic the shape of his bone disorder." *Id*. ¶ 68.

Defendant responded by scheduling a meeting with the school principal, assistant principal, social worker, and the parents of the two boys "to address what Defendant characterized as the mutual conflict between the two boys." *Id*. ¶ 69. At the meeting on May 13, Plaintiff objected that the boys were not in "mutual conflict" — rather, Plaintiff explained, D.K. was bullying M.M. *Id*. ¶ 70.

As the meeting ended, Plaintiff was asked to sign a document listing the topics discussed at the meeting. *Id*. ¶ 72. Plaintiff refused to sign because the document "did not refer to the ongoing harassment and bullying as an issue." *Id*. ¶ 73. The document did not mention bullying, Defendant's agents explained to Plaintiff, because if it did "an official investigation by the Director of Safety would be mandated." *Id*. ¶ 78. Although Plaintiff requested that an official investigation be conducted, Defendant did not do so. *Id*. ¶ 80. Instead, M.M. and D.K. were merely "instructed to keep out of each other's personal space." *Id*. ¶ 81.

On three separate occasions over the next several days,[2] D.K. "proceeded to use 'personal space' as another method to harass and bully [M.M.]." *Id*. ¶ 83. (The particulars of this harassment are not specified in the complaint.) Plaintiff complained to the school social worker, who responded by "downplaying the seriousness of the continued harassment." *Id*. ¶ 85.

---

[2] The meeting occurred on Friday, May 13, 2011. Compl. ¶ 69. The harassment allegedly occurred from Monday, May 16 through Wednesday, May 18, 2011. *Id*. ¶ 83.

A short time later, Plaintiff enrolled her son in a different school district for the following school year. *Id.* ¶ 86.

As seventh grade was coming to an end in June 2011, Plaintiff accompanied M.M. on a school "Field Day event." *Id.* ¶ 87. At the event, held on June 2, "D.K. and other students threw pizza crusts and potato chip bags at [M.M.]" *Id.* The next day, the social worker "approached Plaintiff and asked if her son could provide a statement regarding the incident that occurred the day before." *Id.* ¶ 89. When Plaintiff agreed, the social worker "proceeded to ask [M.M.] questions in such a manner as to suggest that he was in the wrong for attempting to meet his friends at a location near D.K." *Id.* ¶ 90.

## C

On June 3, 2011, Plaintiff filed a complaint with the United States Department of Education Office for Civil Rights alleging that M.M. was being harassed. *Id.* ¶ 91. Four days later, Plaintiff withdrew M.M. from school for the remainder of the year. *Id.* ¶ 92. In November 2011, "Defendant signed a Resolution Agreement regarding Plaintiff's complaint to the Office for Civil Rights requiring that Defendant issue a letter to Plaintiff by certified mail inviting her son to return to the School District." *Id.* ¶ 105. No letter has been sent. *Id.* ¶ 106.

In January 2012, Plaintiff filed suit in this Court alleging violations of the Americans with Disabilities Act, 42 U.S.C. § 12132; the Rehabilitation Act, 29 U.S.C. § 794; Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681; and related state law claims.

Defendant now moves to dismiss for failure to state a claim on which relief can be granted. ECF No. 7. Defendant argues that the claims should be dismissed because the alleged bullying was not based on M.M.'s sex or disability, the alleged bullying did not create an abusive educational environment, and Defendant was not deliberately indifferent to the alleged bullying.

For the reasons that follow the Court will grant Defendant's motion and dismiss Plaintiff's complaint without prejudice.

## II

To survive a Rule 12(b)(6) motion to dismiss, the pleading "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (internal quotation marks omitted) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the [party] pleads factual content that allows the court to draw the reasonable inference that the [opposing party] is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 555–56). A court must accept all factual content in the pleading as true, however, a court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). "In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. . . . When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 129 S. Ct. at 1950.

## III

## A

Defendant first moves to dismiss the sex discrimination claim brought pursuant to Title IX of the Education Amendments of 1972 (codified as amended at 20 U.S.C. §§ 1681–85). In pertinent part, the statute provides: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

The purpose of Title IX, as originally conceived, was "banning discrimination against women in the field of education."  *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 523 (1982).  Summarizing the bill that would become Title IX, Senator Birch Bayh explained: "Amendment No. 874 is broad, but basically it closes loopholes in existing legislation relating to general education programs  . . .   [T]he heart of this amendment is a provision banning sex discrimination in educational programs receiving Federal funds.  The amendment would cover such crucial aspects as admissions procedures, scholarships, and faculty employment."  *Id.* at 524 (emphasis omitted) (quoting 118 Cong. Rec. 5803 (1972)).  Responding to a fellow senator's question regarding the scope of the proposed protections, Senator Bayh elaborated: "[W]e are dealing with three basically different types of discrimination here.  We are dealing with discrimination in admission to an institution, discrimination of available services or studies within an institution once students are admitted, and discrimination in employment within an institution."  *N. Haven Bd. of Educ.*, 456 U.S. at 526 (emphasis omitted) (quoting 118 Cong. Rec. 5812); *see also Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286 (1998) (discussing purpose of Title IX); *Cannon v. Univ. of Chi.*, 441 U.S. 677, 704 (1979) (same).[3]

While not immediately obvious from the text or the legislative history, in *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999), the Court held that Title IX creates a private cause of action for a student against a school based on student-on-student sexual harassment "in certain limited circumstances." [4]  *Id.* at 643.  Specifically, "funding recipients are

_____

[3] "Although the statements of one legislator made during debate may not be controlling," the Court has since observed of the legislative history of Title IX, "Senator Bayh's remarks, as those of the sponsor of the language ultimately enacted, are an authoritative guide to the statute's construction."  *N. Haven Bd. of Educ.*, 456 U.S. at 526–27 (citation omitted) (citing *Chrysler Corp. v. Brown*, 441 U.S. 281, 311 (1979); *FEA v. Algonquin SNG, Inc.*, 426 U.S. 548, 564 (1976); *NLRB v. Fruit Packers*, 377 U.S. 58, 66 (1964); and *Schwegmann Bros. v. Calvert Distillers Corp.*, 341 U.S. 384, 394–95 (1951)).

[4] The holding is not immediately obvious from the text of the statute, for example, as the text does not expressly create private cause of action or impose liability on covered entities, such as schools, for the acts of third

properly held liable in damages only where they are deliberately indifferent to sexual harassment, of which they have actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Id*. at 650.

To establish a prima facie case of student-on-student sexual harassment under Title IX, a plaintiff must establish three elements:

> (1) the sexual harassment was so severe, pervasive, and objectively offensive that it could be said to deprive the plaintiff of access to the educational opportunities or benefits provided by the school,
> (2) the funding recipient had actual knowledge of the sexual harassment, and
> (3) the funding recipient was deliberately indifferent to the harassment.

*Pahssen v. Merrill Cmty. Sch. Dist.*, 668 F.3d 356, 362 (6th Cir. 2012) (citing *Soper v. Hoben*, 195 F.3d 845, 854 (6th Cir. 1999)).

Here, Defendant acknowledges that it is a recipient of federal funds and therefore subject to the requirements of Title IX.  Conceding that the complaint alleges that Defendant had actual knowledge of the conduct at issue, Defendant challenges the remaining two elements.

**1**

Being a child, the Supreme Court cautions, "is far more than a chronological fact.  It is a fact that generates commonsense conclusions about behavior." *J.D.B. v. North Carolina*, 131 S. Ct. 2394, 2403 (2011) (internal quotation marks omitted) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 674 (2004) (Breyer, J., dissenting), and *Eddings v. Oklahoma*, 455 U.S. 104, 115

---

parties, such as students.  These have been  judicially implied.  *See Cannon v. Univ. of Chi.,* 441 U.S. 677 (1979) (creating private cause of action); *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999) (creating third party liability).  Likewise, as Justice Kennedy noted in a four-justice dissent in *Davis*, "When Title IX was enacted in 1972, the concept of 'sexual harassment' as gender discrimination had not been recognized or considered by the courts." *Davis*, 526 U.S. at 658 (Kennedy, J., dissenting) (citation omitted) (citing Catharine MacKinnon, *Sexual Harassment of Working Women: A Case of Sex Discrimination* 59–72 (1979)).

(1982); citing *Gall v. United States*, 552 U.S. 38, 58 (2007); *Roper v. Simmons*, 543 U.S. 551, 569 (2005); and *Johnson v. Texas*, 509 U.S. 350, 367 (1993)).

Consequently, while "severe and pervasive conduct" is a familiar phrase — one borrowed from the "hostile work environment" jurisprudence of Title VII — it has a distinct application in Title IX. *Davis*, 526 U.S. at 651; *cf. Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986). That is, although the Supreme Court has imported "hostile environment" principles from Title VII to Title IX, the Court has warned that trial courts "must bear in mind that schools are unlike the adult workplace and that children may regularly interact in a manner that would be unacceptable among adults." *Davis*, 526 U.S. at 651; *cf. Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79–81 (1998) (establishing same-sex hostile work environment claims are actionable under Title VII). Thus, to evaluate student-on-student hostile environment claims under Title IX a court must consider the same basic criteria as in Title VII — the "constellation of surrounding circumstances, expectations, and relationships." *Davis*, 526 U.S. at 651 (quoting *Oncale*, 523 U.S. at 82). Yet the court must also account for basic differences between children and adults.

Among the particular circumstances unique to student-on-student claims are certain truths that "are self-evident to anyone who was a child once himself." *J.D.B.*, 131 S. Ct. at 2403. For example, "at least early on, students are still learning how to interact appropriately with their peers. It is thus understandable that, in the school setting, students often engage in insults, banter, teasing, shoving, pushing, and gender-specific conduct that is upsetting to the students subjected to it." *Davis*, 526 U.S. at 651. Standing alone, however, this conduct does not give rise to liability. Title IX, like Title VII, does not create a federal code of manners. *Davis*, 526 U.S. at 652; *see Oncale*, 523 U.S. at 81.

"Damages are not available for simple acts of teasing and name-calling among school children," the Supreme Court instructs, "even where these comments target differences in gender." *Davis*, 526 U.S. at 652. Rather, to be actionable, the conduct must be both: (1) so severe and pervasive that it effectively renders the victimized student "excluded from participation in" or "denied the benefits of" the education that Title IX is designed to protect;[5] and (2) "based on sex." 20 U.S.C. § 1681(a); *see Davis*, 526 U.S. at 650–52.

In *Davis*, for example, a young lady in fifth grade was repeatedly harassed by a fellow fifth grader who "attempted to touch [the young lady's] breasts and genital area and made vulgar statements such as 'I want to get in bed with you' and 'I want to feel your boobs.'" 526 U.S. at 634 (internal quotation marks omitted). Despite the young lady's reports of these incidents to the school, the young man was not disciplined. The vulgar conduct continued. In the following months, the young man "placed a door stop in his pants and proceeded to act in a sexually suggestive manner toward [the young lady]" and later "rubbed his body against [the young lady] in the school hallway in what [the young lady] considered a sexually suggestive manner." *Id*. The young lady's grades dropped. After five months, she composed a suicide note. After six months, criminal charges were brought against the young man, who pled guilty to sexual battery for his assaults on the young lady.

The young lady's mother brought suit alleging a violation of Title IX. The school moved to dismiss the case pursuant to Rule 12(b)(6). The district court granted the motion. Sitting en banc, the Eleventh Circuit affirmed the judgment of the district court. The Supreme Court reversed. Concluding that the conduct was sufficiently severe and pervasive to survive the

---

[5] "Examples of a negative impact on access to education," the Seventh Circuit observes, "may include dropping grades, becoming homebound or hospitalized due to harassment, or physical violence." *Gabrielle M. v. Park Forest-Chicago Heights, Ill. Sch. Dist. 163*, 315 F.3d 817, 823 (7th Cir. 2003) (internal citations omitted) (citing *Davis*, 526 U.S. at 634, *Vance v. Spencer Cnty. Public Sch. Dist.*, 231 F.3d 253, 259 (6th Cir. 2000); *Murrell v. Sch. Dist. No. 1, Denver, Colo.*, 186 F.3d 1238, 1248–49 (10th Cir.1999)).

school's 12(b)(6) motion, the Court wrote: "The harassment was not only verbal; it included numerous acts of objectively offensive touching, and, indeed, [the boy] ultimately pleaded guilty to criminal sexual misconduct. . . .   On this complaint, we cannot say beyond doubt that petitioner can prove no set of facts in support of her claim which would entitle her to relief."  *Id*. at 653–54 (internal alterations and quotation marks omitted) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46 (1957)).

Two leading Sixth Circuit decisions regarding student-on-student harassment similarly involve young men sexually assaulting young women.  In *Soper v. Hoben*, 195 F.3d 845 (6th Cir. 1999), a plaintiff alleged that her middle school daughter was raped and otherwise sexually abused by several male students.  *Id*. at 854.  "This obviously qualifies as being severe, pervasive, and objectively offensive sexual harassment that could deprive [the young woman] of access to the educational opportunities provided by her school," the Sixth Circuit observed.  *Id*. at 855.  Likewise, in *Vance v. Spencer County Public School District*, 231 F.3d 253 (2000), the court held that a plaintiff had submitted sufficient evidence of severe and pervasive harassment when her daughter was subjected to repeated "verbal propositioning and name calling" and then physically assaulted: "two male students held [the daughter] while others yanked off her shirt, pulled her hair, and attempted to disrobe."  *Id*. at 259.

As noted, each of these cases involved male students harassing female students, ostensibly because of sexual desire.  The basis of the conduct was indisputably sex.  This case, however, involves one male student harassing another — ostensibly not because of sexual desire.[6]  *Cf. Wasek v. Arrow Energy Servs*., --- F.3d ----, 2012 WL 2330824, at *3 (June 20,

---

[6] *See generally* Laura Sullivan, *An Evolutionary Perspective of Peer Sexual Harassment in American Schools: Premising Liability on Sexual, Rather than Power Dynamics*, 3 Wm. & Mary J. Women & L. 329, 334–45 (1997) (discussing evolutionary theories on what motivates peer sexual harassment); *but see generally* Michel Foucault, *The History of Sexuality: Volume I: An Introduction* 78 (1990) ("Sex, the explanation for everything.").

2012) (noting the "key evidentiary differences between mixed-gender and same-gender sexual harassment").

Although not expressly intended by the drafters of Title IX, courts have extended the protections of Title IX to student-on-student harassment involving students of the same sex. *See, e.g.*, *Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 165 (5th Cir. 2011); *Wolfe v. Fayetteville, Ark. Sch. Dist.*, 648 F.3d 860, 865 (8th Cir. 2011); *Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 66 (1st Cir. 2002).

In these cases, the basis of the conduct is often not sexual desire, but sexual stereotypes (for example, one male student bullying another because victim's effeminateness). *See generally Price Waterhouse v. Hopkins*, 490 U.S. 228, 250 (1989) (plurality) (holding that Title VII prohibits discrimination against women on the basis that they do not act sufficiently feminine). As the Court explained in *Hopkins*, a "sex stereotyping" case brought under Title VII, "an employer who acts on the basis of a belief that a woman cannot be aggressive, or that she must not be, has acted on the basis of gender." *Id.*; *see Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 617 (1999) (noting that the Court looks "to its Title VII interpretations of discrimination in illuminating Title IX").

Complicating the inquiry, however, while discrimination based on noncompliance with sexual stereotypes may be actionable under federal law, discrimination based on sexual orientation is not. *E.g.*, *Spearman v. Ford Motor Co.*, 231 F.3d 1080, 1085 (7th Cir.2000) (holding the employer was not liable because "the record . . . shows that Spearman's co-workers maligned him because of his apparent homosexuality, and not because of his sex"); *see generally Hamm v. Wyauwega Milk Prods., Inc.*, 332 F.3d 1058, 1066–68 (7th Cir. 2003) (Posner, J., concurring); *but see generally* Katherine M. Franke, *The Central Mistake of Sex Discrimination*

*Law: The Disaggregation of Sex from Gender*, 144 U. Pa. L. Rev. 1, 77–80 (1995) (challenging the notion that "courts, or anyone for that matter, can, or should, distinguish in any principled manner between impermissible cultural stereotypes and permissible commonly accepted social norms").

Notwithstanding this analytical complication, the law is settled that a Title IX claim is only cognizable if there is evidence that the offender acted because of the victim's sex. "Discrimination on the basis of sex is the sine qua non of a Title IX sexual harassment case," the First Circuit explains, "and a failure to plead that element is fatal." *Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 66 (1st Cir. 2002). In accord, the Fifth Circuit writes: "Same-sex sexual harassment is actionable under title IX. The offensive behavior must, however, be based on sex, per the words of title IX, and not merely tinged with offensive sexual connotations." *Sanches*, 647 F.3d at 165 (internal quotation marks omitted) (quoting *Frazier*, 276 F.3d at 66; and citing *Doe ex rel. Doe v. Dallas Indep. Sch. Dist.*, 153 F.3d 211, 219 (5th Cir. 1998)). Putting the point more forcefully, the Eighth Circuit emphasizes: "Title IX imposes liability on a school district for discrimination only if the discrimination is 'on the basis of sex.' We glean from this language of the statute a requirement of underlying intent, and therefore motivation, on the part of the actor to discriminate because of one's sex or gender." *Wolfe*, 648 F.3d at 865.

Neither the Supreme Court nor the Sixth Circuit has yet addressed the standards for evaluating same-sex student-on-student harassment under Title IX. Both have, however, provided guidance by evaluating same-sex harassment under Title VII. *Oncale*, 523 U.S. at 80–82; *Wasek*, 2012 WL 2330824, at *3–4. "The critical issue," the Supreme Court explains, "is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Oncale*, 523 U.S. at 80 (quoting *Harris v.*

*Forklift Sys., Inc.*, 510 U.S. 17, 25 (1993) (Ginsburg, J., concurring)).  The Court cautions that "harassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex."  *Oncale*, 523 U.S. at 80.  For example, a claim may be stated "if a female victim is harassed in such sex-specific and derogatory terms by another woman as to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace."  *Id*.  But, crucially, the harassing conduct must be motivated by the victim's sex: "Whatever evidentiary route the plaintiff chooses to follow, he or she must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted *discrimination* because of sex."  *Id*. at 81 (internal quotation marks and alterations omitted) (emphasis in original).

Other circuit courts have addressed standards for evaluating same-sex student-on-student harassment under Title IX.  In *Sanches v. Carrollton-Farmers Branch Independent School District*, 647 F.3d 156 (5th Cir. 2011), for example, one high school girl harassed another by starting rumors that she was pregnant and calling her a "ho."  *Id*. at 165.  Concluding that the school was entitled to summary judgment, the Fifth Circuit explained: "J.H. was upset with Sanches because Sanches was dating J.H.'s ex-boyfriend . . . .  There is nothing in the record to suggest that J.H. was motivated by anything other than personal animus.  Her conduct . . . is more properly described as teasing or bullying than as sexual harassment."  *Id*. at 165–66.

Similarly, in *Seamons v. Snow*, 84 F.3d 1226 (10th Cir. 1996), a male high school student did not state a claim under Title IX because he did not allege facts showing that the harassment was "based on sex."  After teammates on the high school football team humiliated the young man,[7] he complained to school authorities.  *Id*. at 1230.  The authorities responded by suggesting

---

[7] Specifically, the young man, Brian, was "grabbed as he came out of the shower, forcibly restrained and bound to a towel rack with adhesive tape.  Brian's genital area was also taped.  After Brian was restrained, one of his

he "should have taken it like a man" and that "boys will be boys." *Id*. The young man brought suit asserting that the schools response violated Title IX because it "expected him to conform to a macho male stereotype." *Id*. The district court granted the school's motion to dismiss. The Tenth Circuit affirmed the judgment, explaining that although the statements had sexual connotations, the plaintiff did not allege that he was discriminated against because he was male:

> Brian points to comments made by school officials such as "boys will be boys" and "he should take it like a man" to support his argument that he was subjected to a sexually hostile school environment. These statements, however, fall short of showing sex discrimination. The qualities Defendants were promoting, team loyalty and toughness, are not uniquely male. The fact that the coach, and perhaps others, described these qualities as they pertain to his situation in terms of the masculine gender does not convert this into sexual harassment. Brian has not alleged that Defendants would have acted differently if a similar event had occurred in the women's athletic program. To the contrary, Brian's complaint alleges that such hazing has also occurred to women at Sky View High School and that it has similarly gone unaddressed by school officials.

*Id*. at 1233; *see generally Vickers v. Fairfield Med. Ctr.*, 453 F.3d 757, 762–66 (6th Cir. 2006) (discussing "sex stereotyping" claims under Title VII).

In this case, assuming without deciding that the conduct alleged was sufficiently severe and pervasive to state a claim under Title IX, the complaint must nevertheless be dismissed because it does not offer any facts suggesting that D.K (or any other person, for that matter) harassed M.M. "on the basis of sex."

The harassment began, the complaint alleges, when M.M. was in primary school. Specifically, it began during the 2005–2006 school year, when M.M. "became the target of bullying in the second grade by various classmates and more specifically another minor, D.K." Comp. ¶ 8. As the complaint does not elaborate the form or content of this harassment, no inference of sex-based discrimination can be drawn from this allegation.

---

teammates brought a girl that Brian had dated into the locker room to view him. All of this took place while other members of the team looked on." *Seamons v. Snow*, 84 F.3d 1226, 1230 (10th Cir. 1996).

The next allegation of harassment concerns the 2007–2008 school year, when Plaintiff informed the school principal that M.M. was being bullied by fellow fourth graders.  *Id.* ¶ 11. Again, the complaint does not elaborate on the particulars of the bullying, and so no inference of sex-based discrimination can be drawn from this allegation.

In fifth grade, the complaint identifies one incident of bullying — on a school field trip "various children refused to sit next to M.M., made him the target of jokes, and effectively ostracized him." *Id.* ¶ 23.  Again, no facts suggest that this conduct was because of M.M.'s sex.

The factual allegations regarding the harassment in middle school are more concrete. Again, however, none suggest that the harassment was sex-based.  Specifically, as M.M. began sixth grade, "D.K. verbally and physically abused [M.M.]" three times during the first week of school.  *Id.* ¶ 29.  The specifics of this abuse (such as what was said) are not identified, and so once again it cannot be inferred that this conduct was because of M.M.'s sex.

The following semester other students also harassed M.M.  *Id.* ¶ 31.  In the spring of 2010, "classmates began repeatedly wishing [M.M.] 'Happy Birthday,' even though his actual birth date is in the month of September."  *Id.* ¶ 36.  Likewise, fellow students asked M.M. if he planned to attend a school dance.  *Id.* ¶ 40.  When he said that he did not plan to, "the various students began mocking [M.M.]."  *Id.* ¶ 41.  Again, the complaint contains no facts suggesting that the basis of either of these incidents was M.M.'s sex.

The next allegation of harassment concerns seventh grade, when D.K. and others set into motion a plan that prevented M.M. from using the restroom.  *Id.* ¶ 49.  Specifically, observing that M.M. "frequently used the restroom at a particular time of day," D.K. and other students ensured "that the hall pass, which was needed to use the restroom, was always in use [during that

particular time of day]." *Id*. ¶ 49.  Again, no facts suggest that this conduct was because of M.M.'s sex.

After the social worker, Plaintiff, and D.K.'s mother met to discuss this incident, "D.K. began referring to [M.M.] as a lesbian, gay, or a hermaphrodite." *Id*. ¶ 52.  Additionally, D.K. "repeatedly told other students . . . that [M.M.] was gay." *Id*. ¶ 53.  About two months later, "D.K. made an obscene gesture during a physical education class where he indicated that [M.M.] had male genitalia in his mouth." *Id*. ¶ 59.  During physical education the following day, "a physical altercation ensued between [M.M.] and D.K." *Id*. ¶ 61.

Although this conduct indisputably has sexual connotations, the complaint offers no facts suggesting that D.K. acted because of M.M.'s sex.  The complaint does not allege facts suggesting that M.M. behaved effeminately or effetely.[8]  The complaint does not allege that D.K. (or any other person, for that matter) indicated a belief that M.M. exhibited effeminate or effete characteristics.  Rather, as in *Sanches*, after drawing all reasonable inferences in Plaintiff's favor, when viewed under the totality of the circumstances the conduct "is more properly described as teasing or bullying than as sexual harassment."  647 F.3d at 165–66.

The final two incidents of harassment similarly do not suggest harassment on the basis of sex.  First, after M.M. and D.K. were "instructed to keep out of each other's personal space," Compl.  ¶ 81, D.K. "proceeded to use 'personal space' as another method to harass and bully [M.M.]" *Id*. ¶ 83.  (The particulars of this harassment are not specified in the complaint.) Second, at a field day event, "D.K. and other students threw pizza crusts and potato chip bags at [M.M.]" *Id*. ¶ 87.  Once again, neither of these instances suggests that the conduct "was motivated by anything other than personal animus." *Sanches*, 647 F.3d at 165.

---

[8] On the contrary, rather than behaving effetely, the complaint alleges after "D.K. made an obscene gesture during a physical education class where he indicated that [M.M.] had male genitalia in his mouth," M.M. engaged in "a physical altercation" with the harasser.  Compl. ¶¶ 59, 61.

In sum, as presently pled the complaint does not allege facts suggesting the conduct complained of was based on M.M.'s sex. While the conduct alleged should not be condoned, the complaint does not state a Title IX claim.

**2**

Against this conclusion, Plaintiff argues that the complaint does state a claim for sexual harassment because, at its core, the harassment was "challenging [M.M.'s] masculinity." Pl.'s Resp. to Def.'s Mot. to Dismiss 13. Plaintiff notes that "plaintiffs may avail themselves of evidence that the harassment is based on a perception that the individual 'is not masculine enough or feminine enough — that is, he or she fails 'to conform to [gender] stereotypes.' " *Id.* 11 (quoting *Vickers v. Fairfield Medical Center*, 453 F.3d 757, 767 (6th Cir. 2006) (Lawson, D.J., dissenting)). In support, Plaintiff cites *Montgomery v. Independent School District No. 709*, 109 F. Supp. 2d 1081 (D. Minn. 2000), asserting: "The facts of the instant case are analogous to *Montgomery*." Pl.'s Resp. 11.

In *Montgomery*, a young man named Jessie "experienced frequent and continual teasing by other students beginning in kindergarten and recurring on an almost daily basis until the end of the tenth grade." 109 F. Supp. 2d at 1084. In addition to repeated physical assaults, the young man was taunted by being called "Jessica," "faggott," "fag," "gay," "girl," "princess," "fairy," "homo," "freak," "lesbian," "gay boy," "bitch," "queer," "pansy," "queen," and "femme boy." *Id.* Bringing a Title IX claim, the plaintiff alleged that "the students engaged in the offensive conduct at issue not only because they believed him to be gay, but also because he did not meet their stereotyped expectations of masculinity." *Id.* at 1090.

Addressing the plaintiff's sexual orientation claim, the court explained that "to the extent that plaintiff asserts Title IX claims based on discrimination due to his sexual orientation or

perceived sexual orientation, these claims are not actionable and must be dismissed." *Id.* (citing *Williamson v. A.G. Edwards & Sons, Inc.*, 876 F.2d 69, 70 (8th Cir. 1989)).   Continuing, the court explained that defendant was not entitled to judgment because the plaintiff specifically alleged that he was harassed because of his "feminine characteristics":

> Plaintiff contends that the students engaged in the offensive conduct at issue not only because they believed him to be gay, but also because he did not meet their stereotyped expectations of masculinity.  The facts alleged in plaintiff's complaint support this characterization of the students' misconduct. He specifically alleges that some of the students called him "Jessica," a girl's name, indicating a belief that he exhibited feminine characteristics.  Moreover, the Court finds important the fact that plaintiff's peers began harassing him as early as kindergarten. . . . The likelihood that he openly identified himself as gay or that he engaged in any homosexual conduct at that age is quite low.  It is much more plausible that the students began tormenting him based on feminine personality traits that he exhibited and the perception that he did not engage in behaviors befitting a boy.

109 F. Supp. 2d at 1090.

In this case, unlike in *Montgomery*, the complaint does not allege that M.M. exhibited feminine characteristics or that he engaged in behaviors more typical of a young lady than a young gentleman.  As noted, the complaint does not allege that D.K. (or any other person, for that matter) indicated a belief that M.M. exhibited effeminate characteristics.  Likewise, the complaint does not allege facts suggesting that M.M. behaved effeminately or effetely.  As presently pled, the complaint does not state a Title IX claim on which relief can be granted.

This is not to suggest, however, that Plaintiff cannot state a Title IX claim.  Simply that she has not done so.  Accordingly, Plaintiff's Title IX claim will be dismissed without prejudice.

**B**

Defendant next moves to dismiss the disability claims brought pursuant to the Americans with Disability Act and the Rehabilitation Act.

Title II of the ADA provides in pertinent part that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  With substantially similar language, § 504 of the Rehabilitation Act provides that no qualified individual with a disability "shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a).

 "Apart from § 504's limitation to denials of benefits 'solely' by reason of disability and its reach of only federally funded — as opposed to 'public' — entities," the Sixth Circuit observes, "the reach and requirements of both statutes are precisely the same."  *S.S. v. E. Ky. Univ.*, 532 F.3d 445, 453 (6th Cir. 2008) (internal alteration omitted) (quoting *Weixel v. Bd. of Educ. of N.Y.*, 287 F.3d 138, 146 n.6 (2d Cir. 2002)).

The Sixth Circuit therefore instructs that the elements of a disability discrimination claim alleging a school is liable for student-on-student harassment are essentially the same under the two statutes.  Courts are to apply the same fundamental principles, regardless of whether the harassment is allegedly based on sex or disability, and "evaluate that claim under the analytical framework set forth in *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999)."  *S.S.*, 532 F.3d at 453.  To state a claim, the complaint must allege facts plausibly suggesting that:

> (1) the plaintiff is an individual with a disability, (2) he or she was harassed based on that disability, (3) the harassment was sufficiently severe or pervasive that it altered the condition of his or her education and created an abusive educational environment, (4) the defendant knew about the harassment, and (5) the defendant was deliberately indifferent to the harassment.

Id. at 454 (quoting *Werth v. Bd. of Dirs. of the Pub. Sch. of Milwaukee*, 472 F .Supp. 2d 1113, 1127 (E.D. Wis. 2007)).

As noted, Defendant acknowledges that it is a recipient of federal funds; thus, it subject to the requirements of the ADA and the Rehabilitation Act.  Defendant further acknowledges Plaintiff is an individual with a disability and that that the complaint alleges that Defendant had actual knowledge of the conduct at issue.  Defendant challenges the remaining elements.

As with the Title IX claim, Defendant is once again correct that the complaint does not contain sufficient factual allegations suggesting that M.M. was harassed because of his disability.

Two cases illustrate why.  In the first, *Werth v. Board of Directors of the Public Schools of Milwaukee*, 472 F .Supp. 2d 1113 (E.D. Wis. 2007), a young man suffered from a congenital bone development disorder "characterized by absent or incompletely-formed collar bones, an abnormally shaped skull, characteristic facial appearance, short stature, and dental abnormalities."  *Id*. at 1116–17.  During woodshop class in ninth grade, several students threw blocks of wood at the young man, resulting in numbness in the legs, swelling in the spine, and an extended period of recuperation that caused the him to miss three months of school.  When he returned, another student teased him and hit him with safety goggles.  The young man brought suit against the school alleging disability discrimination.  Granting judgment to the school, the court explained:

> Although Mary Werth averred that Werth was subjected to verbal attacks and mockery by fellow students because of his disability, Werth has presented no evidence showing that these incidents were related to his disability.  He has offered no proof that Larry W. or Joe F. teased or otherwise harassed him on October 16, 2001, or any day before that, because of his disability.  Also, there is nothing in the record showing that Roberto S. teased Werth due to his disability or that Roberto S. teased or otherwise harassed him on any day because of his disability.

*Id.* at 1128.  Thus, the complaint's conclusory allegations that the harassment was because of the young man's disability were deemed insufficient.  Facts are necessary to state a claim.  *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

Illustrative of such facts are the second case, *Doe v. Big Walnut Local School District Board of Education*, --- F.Supp.2d ----, 2011 WL 3204686 (S.D. Ohio July 27, 2011).  There, a young man was diagnosed with cognitive disorder, which created difficulties with social interactions and learning as quickly as other students, and so was placed in individualized education plan classes.  Alleging extensive bullying by other students, he brought a number of claims against the school, including an ADA violation.  The school moved for summary judgment.  The district court concluded that the young gentleman had introduced sufficient facts to demonstrate a triable issue of fact about whether he was discriminated because of his disability.  A fellow student testified that the young man "was bullied because he was known to be in [individualized education plan] classes."  Id. at 14.  The plaintiff's expert also testified regarding the motivation for the bullying.  "This evidence," the court wrote, "is weak at best," but sufficient to create a question of fact regarding the reason for the bullying.  *Id.*

In this case, the complaint does not plead facts plausibly suggesting that M.M. was harassed because of his disability.  The sole factual allegation of harassment regarding M.M.'s disability is the young man's complaint to the school social worker in the spring of seventh grade that D.K. had "mocked [M.M.'s] stance and posture affected by [multiple hereditary exostoses] and poked his arm out of his sleeve to mimic the shape of his bone disorder."  Compl. ¶ 68.

Although the complaint alleges that on this one instance M.M. was teased about his disability — about five years after the alleged bullying began — the complaint does not suggest

that M.M. was harassed because of his disability.  Of course, it is possible that the harassment was based on M.M.'s disability.  That is, it is possible that from second grade onward D.K. harassed M.M. because D.K. harbored discriminatory animus regarding M.M.'s disability, and that this discriminatory animus eventually manifested itself in seventh grade on this one occasion.  But no facts suggest that this explanation for D.K.'s behavior is more plausible than any other.

Two counterfactuals illustrate why.  For example, the complaint alleges that D.K. threw pizza crusts and potato chip bags at M.M. on another occasion.  This does not suggest, however, that D.K. harbored discriminatory animus regarding M.M.'s dietary habits.  Likewise, the complaint alleges that D.K. interfered with M.M.'s ability to check out the hall pass to use the bathroom.  This does not suggest that D.K. harbored discriminatory animus regarding M.M. using the bathroom.  Likewise, when the constellation of the surrounding circumstances are considered, the allegation that on one occasion D.K. mocked M.M.'s posture and mimicked the shape of his bone disorder does not suggest D.K. harassed M.M. because of the young gentleman's disability.

As presently pled, the complaint does not state facts which plausibly suggesting that M.M. was discriminated against because of his disability.  The Court will dismiss the ADA and Rehabilitation Act claims without prejudice.

### C

Having dismissed the federal claims, the Court declines to exercise supplemental jurisdiction over the remaining state law claims.  28 U.S.C. § 1367(a) provides, "The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction."  Indeed, "a federal court that has

dismissed a plaintiff's federal-law claims should not ordinarily reach the plaintiff's state-law claims." *Moon v. Harrison Piping Supply*, 465 F.3d 719 (6th Cir. 2006) (citation omitted), *quoted in Scott v. Hemlock Semiconductor Corp.*, No. 06-14903-BC, 2007 U.S. Dist. LEXIS 88012, at *8 ( E.D. Mich. Nov. 30, 2007). *See also United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial . . . the state claims should be dismissed as well."); *Perry v. Se. Boll Weevil Eradication Found.*, 154 F. App'x 467, 478 (6th Cir. 2005) (noting that dismissal is the "clear rule of this circuit"). As the Court has emphasized, "[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *Gibbs*, 383 U.S. at 726.

## IV

Accordingly, it is **ORDERED** that Defendant's motion to dismiss (ECF No. 7) is **GRANTED**.

It is further **ORDERED** that the complaint is dismissed without prejudice.

It is further **ORDERED** that Plaintiff is granted leave to file an amended complaint on or before **July 17, 2012**. If no complaint is filed on or before this date, a judgment shall be entered dismissing Plaintiff's case with prejudice.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: June 27, 2012

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on June 27, 2012.

s/Tracy A. Jacobs
TRACY A. JACOBS